The next case for argument is 17-2556, Umbanet v. Epsilon Data Management statement made in oral argument below certainly was inelegant. But in the context of the briefing and the way that the 101 motion was briefed, what counsel below meant was that because the 730 patent is generally broader than the 374 patent, if the 730 patent was a patentable non-abstract idea, then the 374 patent, which contains essentially the same claim limitations as the 730 patent, plus the role mode limitation, should also be a patentable non-abstract idea. The role mode limitation just makes it more patentable, and counsel below explained that the 374 patent adds the additional role mode limitation, requiring not merely selective display of email, but that the authoring component of the claimed email client is responsive to a role mode encoded in the email, and that that provides novel advantages over, for example, password method of implementing a selective display or using executable code within the email to do that. So counsel below's statement about the 374 patent may not have been the best way of putting it, but he certainly didn't mean to say that the 374 patent is not important, merely that it should, if the 730 patent survived the 101 analysis, then the 374 patent certainly should have. But what do you do with the trial court's finding that even the concept of a role mode, even if that was adequately developed, that that's not new? Well, if the claim had been limited, if the claim language had been simply that the email message determines how much information in the email message will be displayed based on the role of the recipient, that would be claiming the result. That would be a problem if the claim limitation didn't have any explanation or didn't have any language in the claim limitation that explained how the role mode functionality was implemented. But that's not the claim limitation in the 374 patent. The 374 patent claim limitation is at least one of said authoring or reading components is responsive to a role mode encoded in an email message, whereby said role mode determines how much information in said message is displayed. So that first part of that claim limitation is the how. The second part is the result. And claiming the result alone, again, would be a problem under 101. So in your view, the key is the role mode, this being encoded in the email message. Is that right? That's the thing that you think makes it so it's not abstract. Is that correct? That's correct. And that in combination also with the authoring reading component being responsive to the role mode being encoded in the email. Because it's not just that the role mode is encoded in the email. That provides an advantage. But the fact that what implements selective display is that the component programmed into the email client is responsive to that role mode, that tag in the email. And that's by putting the code that implements selective display within the email client rather than within the email message. It provides enhanced user functionality. It provides the security advantages that are discussed in the specification. That's the how it's done that makes this a case like NFISH or ANCORA or FINGEN. But did that technology pre-exist for other purposes? For purposes other than having a role mode, that technology that you say provides this added security, that pre-existed, right? That technology within... With the MIM or MIME messaging, that all, all of that pre-existed. Your idea of using that technology in order to have a role mode. So the MIME standard certainly pre-existed. But the idea of using the MIME standard to implement this functionality, that was novel. That's what never existed before. It's the exploitation, it's the novel exploitation of those email standards that is the patentable improvement to computer functionality here. In the same way that claims in ANCORA stored data to memory in different ways. Even though those memory structures existed before, even though the information being stored to those, to the BIOS or to the hardware devices had existed before. It was the novel way of storing that data in ANCORA that this court found was a non-abstract idea. That's what's happening here with the 374 patent. The novel way of structuring data within the email standard, within the MIME structure, is what allowed this new functionality. That novel way of structuring data to provide an improvement to computer functionality. So I understand that that novel way of structuring the data that was claimed in the 730 patent? So the novel way of structuring data to implement the role mode functionality is in the 374 patent. The novel way of encoding data, of encoding non-text data into an email is what's claimed in the 730 patent. The 730 patent discusses, so prior to the 730 patent, what you had to do to send say a spreadsheet in an email, you created the spreadsheet with a separate program. Probably not Excel if you're going back to 1997. I'm not sure what it was back then. But you create the spreadsheet in a separate file and you attach it to the email. You've got to find it in your computer folders. You've got to attach it. The recipient has to find it and make sure they have the right program to read it. That was a problem. That created user functionality issues. What the 730 patent does, is it says within the MIME standard, you can put the spreadsheet functionality or whatever non-text data functionality you want, within a component of the email client, both on the authoring component to write the spreadsheet within the body of the email, and a reading component to read the spreadsheet within the body of the email. And what you then do to encode that into the MIME structure, you use a tag within the MIME structure to tell the recipient computer what authoring component created the data and what reading component should read and display the data. That was a novel use of those MIME tags that hadn't been done before. Where in the 374 and the specification does it describe this process of encoding in the email message the roll code information? The claim itself is very general. Sorry, I believe that's called out. There it is. So it's in appendix 423, column 14. And the paragraph, column 14 lines 41 to 52, describes the prior art JavaScript method that we've mentioned in our brief. And then at the end it explains, according to the preferred embodiment of the invention, no executable code is contained in a message, only tags which are read by the authoring reading component. So that's part of the specification, certainly at least one part of the specification, that describes how the roll mode is implemented through tags in the email message. And that matches the language in the claim limitation of the 374 patent claim 11. But if the court is concerned that that claim limitation might not automatically, that the claim language read alone might not be sufficient to be a non-abstract idea at step one of ALICE, certainly there are factual allegations in the complaint. There's an inventor declaration submitted along with the complaint explaining how these claim limitations set forth, separate the idea from the abstract idea of selective display. And under Atrix and Berkheimer, those factual allegations certainly should have precluded the dismissal at the Rule 12b6 stage that the district court made below. At a minimum, we believe that the claim language itself is enough to make this a non-abstract idea. But at a minimum, the 101 decision should be vacated and remanded because the court improperly ignored the factual allegations of the complaint at the 12b6 stage. And then I guess just the last point I'd like to make is on the 112 issue. That my colleague's primary argument in the briefs was that the specification didn't provide enough detail. It didn't go into enough detail on the code as to how the non-text data is exactly encoded in the email. That's not the standard this court set in Typhoon Touch, and that would be a very dangerous standard for this court to set. You don't really dispute that these are means plus function claims, do you? We do. Certainly it's an uphill battle on the encoding means term for which there's presumption. The document encoding component term is presumed not to be a means plus function term. And for the reasons set forth in our brief, the term component has independent mean within software, also explained in the specification. But certainly if they are means plus function terms, there's a corresponding structure algorithm. If they're not means plus function terms, then the district court should be reversed on that a lot. What is the part of the specification that you think is best disclosing the corresponding structure for the encoding means and the decoding means? That would be the description of the algorithm at columns three and four of the 730 patent. And specifically encoding and decoding, not the whole process? Encoding and decoding the non-text data, that is non-text representation. And with that, I'd like to reserve the remainder of my time. Thank you. Good morning. May it please the court, Pratik Shah for APALE Epsilon Data Management. With the court's permission, I'd like to start with the 374 patent. Now, appellant seeks to avoid the section 101 determination by contending, and this is for the first time on appeal, that the patent covers the following improvement on computer functionality. Not just selective display of a single email based on a role mode, as it really argued, albeit in passing below, but rather by encoding a role mode in a manner that avoids security problems. Not only is that latter argument plainly waived, it just was not made below in any shape or form, but the representative claims themselves. There is a statement in the complaint that says prior to the 374, there was absolutely no way for a sender of a message to control and select the amount of the message that's read by a recipient or displayed over the course of a sequence of communications. And we have the same statement in the inventor declaration. Right. Your Honor, I completely agree that that is how it was teed up below, the line that you exactly read. There was absolutely no way for a sender of a message to control and select the amount of message that is read by the recipient or displayed over the course of the sequence of communications. So as they argued it below, the key innovation was now you can send a single email, and based on the role mode, it would be selectively displayed to the recipient. That is no longer their argument on appeal, as you just heard today. Now their argument is it's not just that. Prior Art allowed you to do that, or that would be too abstract. A lot to happen in a way that wasn't secure. Exactly. They now emphasize it's a role mode encoded in an email in a way that avoids security problems. That argument, while it's well-developed in their brief, was never mentioned below. So how could the District Court have addressed that argument, that this is the improvement on computer functionality? Their whole argument on appeal is based on ENFISH, that you have an improvement in computer functionality. But that improvement was not articulated below, and so the District Court could not have addressed it. And page 18 of their blue brief makes clear that the Prior Art did allow for the portion that you read, paragraph 17 of the complaint, selective display of a single email based on role mode, the innovation, they say, to make it non-abstract. I mean, the specification calls out JavaScript. Exactly. And that portion of the specification, which he pointed to and which you're just mentioning, was never cited in the District Court. That's the only part of the specification that talks about how the preferred embodiment overcomes some security problems with JavaScript. Okay, so maybe it's a waiver problem, but if they had pointed to that. Sure. Would that be a 101 problem or an enablement problem? Well, what it would be, I don't think it would... If, in fact, the claim limitation did just that, if it did overcome that computer security problem, the claim limitation itself, and not the preferred embodiment, that might get you past 101, had it not been waived. But here's the disconnect. As that portion of the specification makes clear, and just so you have it in front of you as I read it, it's the portion that he read. So it's at JA 423, it's column 14, lines 50 to 52, and this is the paragraph talking about the JavaScript problem. It says, quote, according to the preferred embodiment of the invention, no executable code is contained in a message, only tags which are read by the authoring reading component. So it is true that this paragraph describes a preferred embodiment, which would solve that computer security problem. The problem they have is that the claim limitation itself doesn't solve that problem. And as we know from Symantec and other decisions, the improvement in computer functionality has to be in the claim limitations itself. And all the claim limitation says is a role mode in an email, encoded in an email. And as this paragraph makes clear, JavaScript was also encoded in an email. So you're saying this is a step two issue rather than a step one issue? It's certainly at best a step two issue, but even if you got to that step two issue, what they're claiming is the improvement that this could overcome that security problem, that is nowhere in the claim limitation. So it's just like Symantec, where the patentee in that case said, look, this is not just a general method of filtering email and detecting for viruses. We are now solving this problem of reducing the protection gap, making it work faster. And what this court said is, well, that would, in fact, be an improvement on computer functionality, either under step one or step two. The problem is that's just in the specification in the preferred embodiment. It's not in the claim limitation itself. And they have the same problem here. As that specification excerpt makes clear, the preferred embodiment solves a problem, but not the limitation. And here's why. The limitation says the part that they're now emphasizing on appeal, but that they did not mention a single time in the district court. What that portion does is it says the role mode has to be encoded in an email. That's the key phrasing, encoded in an email that they're now emphasizing. But the JavaScript is also encoded in an email. So with that second sentence. That mere fact, though, does differentiate the cases upon which you rely upon, because in those cases there was nothing in the claim that contained the limitation. Here, the limitation is in the claim. It's just a question of how you define it. Well, Your Honor, I guess we would find no difference there because the claim limitation itself here does not offer any improvement in computer functionality. It's just as they said in Blue Brief on 18, the prior art allowed you to do selective display in email. It did it through JavaScript, which is also encoded in an email. So there's nothing in the claim term itself that gets you past this problem. Again, none of this was fleshed out. We didn't have a chance to argue this in the district court. The district court didn't have a chance to pass on this in the district court, because they never argued any of these points about how encoded in enroll role mode improves security. Neither that claim term nor JavaScript nor security appears anywhere in the district court proceedings. And it's not hard to figure that out, because if you go back and look at the about the 40 pages of briefing on Section 101 in the district court, there are four sentences in which they address this claim limitation. And they pick out the best three of them on page 15 of their reply brief to overcome the waiver argument. And it's right there on page 15 of their reply brief, three bullet points. And you can see that this is this is their best attempt to say that they preserved the argument. The first is defendants arguments are based on stripping the claims of most of the limitations and violation of well-established principles that for Section 101 determination, all claim elements must be considered alone in combination. That's just a statement of the law. Nothing to do with the specific argument here. Bullet two, the patents in suit improve upon what was done previously with emails and computers. They solve a problem that did not exist prior to the advent of the new email via the Internet technology. No reference to what the problem was, not even differentiating between the two patents. And then the third bullet where they finally do out of 40 pages of briefing address the 374 patent. It's in these two sentences. The claims of the 374 patent include a feature that allows a single email to be sent to multiple recipients with different email material displayed to each recipient. They do not disclose a permission or passwords based system that restrict access to information. Well, that again, that is that is the basic invention that you started with in paragraph 17 of their complaint. Judge O'Malley sending multiple email, a single email to multiple users based on a role mode that itself is abstract as the district court found. And in fact, it was already implemented in the prior art, as they admit on page 18 of their brief. And so now they need to import this new argument about how encoding in an email message. They're getting into details on the specific reason why, as I understand it, they're now giving the details that they perhaps didn't give before. As you assert, they didn't give before on exactly why there was a problem that was solved. Well, I think it's much more than detail, Your Honor. I understand, but just hypothetically, I have heard your way. Yeah, then I would go back. What is your best argument on the merits? Best argument on the merits is the specification passage itself, which says that this improvement in computer security is part of the preferred embodiment, not within the claims itself. And so when you read that passage and... Your best argument, you think, is just that the sheer breadth of Claim 11 includes JavaScript. Exactly, because it says encoded in an email. JavaScript is also encoded in an email. And as Symantec and other cases make clear, if you want to say that your claim survives 101 based on an improvement in computer functionality, that improvement has to be in the claims. And it's not in the claims here. Were there, in the prior art, were there other types of tags that could be read in an email system? I do not know that. That hasn't been briefed. What we do know is what they say on page 18 of their brief, which is the prior art certainly allowed for selective display of an email based on a single email to different users. I'm just trying to figure out if there were, in the prior art, whether there were tags or something. I don't... Just a minute. Yeah, okay. Other than a role mode. Well, all of those are based on a role mode, Your Honor, because all of them... So how they define role mode, and we didn't get to claim construction... I'm just asking whether you know whether the prior art included tags that would tell, that would indicate something other than a role mode. So my best... And is this the first time anybody ever used tags in this way? I mean, other than a role mode, just using tags other than a JavaScript. To my knowledge, no, but I don't really even fully understand what they mean by tags because it wasn't fleshed out below. What I can answer is it's definitely not the first time based on a role mode because that's just how they define role mode is the identity of a user or sender. And that was well established. And we know that it was done through JavaScript. I don't know if it was done in the way that they would define a tag. Now, on the 730 patent... Why is it? I mean, I understand the argument that you can't just incorporate prior art. But when you're talking about, for purposes of finding that there's enough disclosed, when you're talking about a standard setting organization, I mean, that's not just grabbing something that someone may or may not have come across, right? Yeah, no, I agree with you. And our primary argument on lack of structure on the 730 is not based on the incorporation by reference, although that is a point that we make. Our primary argument is simply referring to the RFCs doesn't tell a person Vortney's skill in the art, doesn't give them a basis in which to perform the recited function. Those RFCs, the MIME language, the MIME language had been around since 1992, as they make the point. There's nothing innovative about the MIME language. It's as if they referred you to an 80-page manual on how to program in the C language. And they say, hey, use that manual to make this program work, to make this patent work. They can't just refer to the MIME standards. Those are formatting standards. One way in which it's been described to me is MIME, you can think of it like a FedEx box. If you put the things in the FedEx box, FedEx will deliver it. But it doesn't tell you what's in the box or how the stuff got into the box. And that's what we have here. They've simply referenced the MIME standards through the RFCs, so we know what the output has to look like. It has to be done consistent with that formatting standard. But it gives no algorithm for how you actually encode the non-text data, which is created by this authoring component, which might take the form of a spreadsheet, might take the form of a PowerPoint presentation, an audio file, any sort of non-text thing, and turn it into an Internet-compatible email. All we know from their algorithm is you have to do it consistent with MIME standards. And the word that they use to substitute on page 58, where they try to translate that algorithm into prose, they substitute the word encode with the word package. But package, and Judge Sewell, I think you were asking about this at the end of the argument, the specific step of encoding the non-text data, where is that described? And the answer is nowhere. It's described nowhere other than in the word package. They say you can see it on page 58. And the claim, remember the claim requires encoding the non-text data created by the authoring component. And the step that corresponds to that is packaging the data. And so it doesn't tell you. What we know from this algorithm and specification is that it has to be MIME-compatible. So it has to be in a format that's consistent with MIME. But it doesn't tell you how to take, and this is the ballgame of this great, of the invention, the purported advance of this invention is you can take all of these different sort of non-text files, PowerPoint, Excel, whatever, create it in the email and have it compatible. But it doesn't tell you how you could go about, how a programmer could go about encoding all of that message into MIME. Can you help me out for a minute? I understand what you're saying. But what kind of thing, what kind of an example of encoding and decoding, what kind of words do you think that this specification could have used? Sure. So it could have described, it could have given an example of, okay, how do you take an Excel spreadsheet and turn it into MIME-compatible language? Or how do you take a PowerPoint presentation and convert it into MIME? It doesn't have to give a source code or anything like that. But just to describe to a person of ordinary skill in the art how to use the MIME formatting standards, again, that just describes how it should work. It's not an enablement problem. It's a problem that nobody knows whether they infringe or not if that structure isn't disclosed. Exactly right. They keep coming back to enable. Oh, a person of ordinary skill in the art could figure out how to do it. Again, even if that were true, which I don't think is true, based on our expert evidence that the district court relied on, even if that were true, exactly right. This is a means plus function claim. And the big tradeoff in means plus function is you don't get every software routine under the sun to implement the invention. You get the one that's actually disclosed in the structure. And they don't disclose anything in the structure that would allow a person of ordinary skill in the art to figure out which software routine they want to use to turn it into MIME-compatible. Do you think there's different software routines available? There is different. There's certainly different ways to encode this non-text information. But that's the black box. And the district court relied on expert evidence here. And this is on page 31 of the joint appendix. When the district court went through this, he says, look, I've looked at all of this. I don't see sufficient structure here to recite the claim functions. And then he looks at the expert evidence on both sides. And he says, look, the expert evidence on Umbanet's side, on plaintiff's side, doesn't adequately explain how this discloses. But the expert evidence submitted by Epsilon does make clear that this is an adequate structure in order to perform the recited functions by a person of ordinary skill in the art. And it cites, this is at appendix 31, it cites JA 185 to 186, paragraph 34, which is our expert's declaration that goes line by line through the portion of the specification that they cite to say that there's adequate structure here discussing the application X and all of those things. And so under this court standard of review, it would have to be clear error to rely on that extrinsic evidence. We think we went under any standard of review, but certainly there is no clear error in the district court. Say more than just, I can't figure it out from this specification, or did it actually come right out and say, as Judge Stoll asked, that there are alternative methods to do this, and I can't figure out which one is being chosen. I think it's more the former, that there just isn't enough structure here to guide someone, a person of ordinary skill in the art, but let me point you to the exact passage, which is at JA 185 to 186, and it's paragraph, it's a chart, and it's paragraph 34 of the chart, and it says this section, it's the 365 to 45 is the main specification excerpt that they rely on, and so it's right in the middle of JA 186, and it says this section references the MIME standard, but does not give an algorithm to automatically encode a representation created with authoring or authoring reading components, stating that this encoding is accomplished is different than providing an algorithm showing how the encoding is accomplished. This section also references an application X MIME type. This appears to be merely a placeholder for any of the standardized MIME types, and is not an algorithm of how to automatically encode a representation. In my opinion, the cited section does not provide the corresponding structure, and what I would say, there was two defects that the district court pointed out to, and that the expert declaration substantiated. One is the one that I've been talking about. It doesn't just show you how to actually encode the non-text data. It just talks about that it has to be compatible with MIME standard. The other defect is it doesn't teach how to do it automatically, which is what the claim limitation teaches, and that's where that expert declaration speaks to the... Can I ask you, the expert declaration there that you just read, you said a placeholder for any of the standardized MIME types. What does that mean? So the best I understand it is there are standardized MIME types and custom MIME types. This is a placeholder to say, look, you can point to something that's a format compatible in MIME that might identify a particular application. As you'll see in other parts this was alluded to in the briefing, at oral argument they got into the fact of how there was no MIME currently, current available MIME handler to allow this functionality to happen. So you would have to create a custom MIME handler, which is something else that they haven't sufficiently disclosed, but that's I guess a third level argument as to why it's not sufficient. But I think the encoding and the automatic encoding get us there, and certainly under clear error, although we don't think we need that standard. We've far exceeded your time for questions. Thank you very much. Thank you, Your Honors. Thank you. I'd like to start by addressing the algorithm in the 730 patent that we just ended on. The algorithm for encoding the data only needs to describe how the encoding is done. And it does not need to go into the detail of how exactly the data is structured, the non-text data is structured within the email. All the algorithm is, and all the algorithm needs to be, is explaining that you take the non-text data, which is a series of 1s and 0s in whatever pattern or whatever format, the authoring component and the reading component used to read. And it's a fairly arbitrary one. You're going to have a different set of 1s and 0s in a different format for spreadsheets, a different format for pictures, a different format for PowerPoint presentations, a different format for AutoCAD files. Whatever you're sending, you're going to have a different format. The key to the encoding step is that you take the non-text data in whatever format the components create it, and you put a tag in the email that says what authoring component created it and what reading component reads it. That's the algorithm that's described in prose at columns 3 and 4 of the 730 patent. That's the algorithm for how the encoding means encodes the non-text representation into an Internet-compliant email. That's all that the claim limitation is. That's all that the means plus function claim is. And that's all that needs to be disclosed. You don't need to go to another level. And that's exactly what this court held in Typhoon Touch, where it held that a prose algorithm that sets forth how the structure, how the program accomplishes the claim function, as long as it does that, then you have sufficient corresponding structure to survive 112 indefiniteness. Now on the 101 issue, first on the waiver issue, my colleague emphasizes that the security issue didn't come up below, but the argument that the claim needed to be construed to include the role mode limitation, that was absolutely argued below. In the oral argument, counsel below said that the 374 patent improved the email technology by the author of the email can make certain portions of the email not available to the recipient. This is done through the authoring component, which is different than what was done before. That's exactly what I've been arguing today. That's exactly what we argued in our brief. That's Appendix 3030. So we absolutely did not waive that argument. The security issue is just additional material in the specification, which on a motion to dismiss is part of the record that explains why that result is useful, but the focus of our argument focuses on the claim construction. And finally, on the merits, my colleague says that his strongest argument on the merits is saying that the description of the embodiment is not imported into the claims, that the claims have a different meaning than we're saying. That's effectively an admission that on the merits of this case, there is a claim construction issue at ALICE Step 2 that needed to be decided not on a motion to dismiss, but on full briefing on claim construction with full evidence taken into account. On the merits of this case, the 101 decision should be vacated at a minimum and remanded for further consideration on the claim construction issue. Thank you. We thank both sides in the cases.